**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

RICHARD A. ROBERTS,

     Petitioner,

v.                                  Case No. 8:21-cv-2745-WFJ-AAS

SECRETARY, DEPARTMENT
OF CORRECTIONS,

     Respondent.

_____/

## <u>ORDER</u>

Richard A. Roberts, a Florida prisoner, timely filed an amended petition for writ of habeas corpus under 28 U.S.C. § 2254. (Doc. 11). Respondent filed a response opposing the amended petition. (Doc. 12). Mr. Roberts filed a reply. (Doc. 15). After careful review, the amended petition is **DENIED**.

## I.    Background

This case arises from Mr. Roberts's sexual abuse of his stepdaughter, H.R., when she was approximately nine years old. Although the abuse took place in the early 1980s, H.R. did not report it to law enforcement until 2013, and the case did not go to trial until the summer of 2015. (Doc. 12-2, Ex. 12, at 90; *see also* Doc. 12-2, Ex. 14, at 203, 205).

Mr. Roberts lived in a house in Pinellas Park, Florida, with H.R., her mother, and her three brothers. (*Id.*, Ex. 14, at 203). Mr. Roberts had married H.R.'s mother shortly before the family moved into the house. (*Id.* at 202-03). H.R. was grounded "for the entire summer" after third grade. (*Id.* at 204). One day, Mr. Roberts entered H.R.'s bedroom

1

during the lunch hour. (*Id.* at 205). He made her "lean against the wall" and told her to "pull [her] panties down." (*Id.*) Mr. Roberts got down on his knees, held his penis in one hand, and digitally penetrated H.R.'s vagina with the other. (*Id.*) Blood began to run down H.R.'s leg, and Mr. Roberts told her to "go clean [herself] up." (*Id.*) Nobody else was home. (*Id.* at 206). Similar incidents occurred "pretty much whenever" around this time. (*Id.* at 206-07). H.R. testified that she observed a scar "[c]lose to [Mr. Roberts's] penis," but she could not recall whether it was "near the pubic area." (*Id.* at 253).

The charged conduct in this case was limited to Mr. Roberts's digital penetration of H.R.'s vagina. (*Id.*, Ex. 2). But the jury heard about other acts of sexual abuse committed by Mr. Roberts on H.R. and her childhood friend and next-door neighbor, Y.F. Around the same time as the abuse recounted above, H.R. and Y.F. set up a tent in a "field" between their houses. (*Id.*, Ex. 14, at 209-10). According to H.R., Mr. Roberts entered the tent, pulled his penis out, and forced both H.R. and Y.F. to touch it. (*Id.* at 210). Y.F. also testified that Mr. Roberts "rubb[ed] his penis" against Y.F.'s vagina. (*Id.* at 261). When H.R. told her mother what happened, she slapped H.R. and instructed her "not to ever say that again." (*Id.* at 211-12). And when H.R. told Mr. Roberts she would disclose the abuse, he said that "the cops were his friends" and that "he could make [her] disappear." (*Id.* at 212).

Y.F. recounted yet another incident of abuse involving Mr. Roberts. One night, she slept over at H.R.'s house, and the two shared a bed in H.R.'s bedroom. (*Id.* at 259-60). While they were asleep, Mr. Roberts entered the room, pulled Y.F.'s underwear aside, and digitally penetrated her vagina. (*Id.* at 260). Y.F. closed her eyes and pretended to be asleep.

2

(*Id.* at 261). Sometime later, Mr. Roberts took Y.F. out on a canoe near Gulfport. (*Id.* at 263). He mentioned "the island with the green stuff" and said that "people disappear there never to be seen again." (*Id.*) Y.F. interpreted this as an instruction "not to tell anyone what happened." (*Id.*)

H.R. and her family moved to Georgia when she was in the fourth grade. (*Id.* at 211). After the move, H.R. lost contact with Y.F. (*Id.* at 262). The next time the two saw each other was during a pretrial hearing in this case. (*Id.* at 263).

H.R.'s mother testified for the defense. She stated that Mr. Roberts had a scar "right around his belt" from being mauled by a "bull on [a] farm." (*Id.*, Ex. 15, at 377). She claimed, however, that he did not have any scars "on his pelvic area" or "near his scrotum." (*Id.*) She also testified that (1) H.R. was a "pretty gregarious, happy little girl," (2) H.R. never disclosed any sexual abuse to her when H.R. was a child, and (3) she never slapped H.R. across the face. (*Id.* at 365-66). H.R.'s brother testified as a defense witness as well. He claimed that, when he "was growing up," H.R. never told him that Mr. Roberts had sexually abused her. (*Id.* at 380).

The jury found Mr. Roberts guilty of sexual battery on a child under twelve years of age. (*Id.*, Ex. 16). The trial court sentenced him to a mandatory term of life in prison without the possibility of parole. (*Id.*, Ex. 17). The appellate court affirmed the conviction and life sentence but reversed for the trial court to "strike [Mr. Roberts's] sexual predator

designation."[1] *Roberts v. State*, 239 So. 3d 1289, 1289 (Fla. 2d DCA 2018). Next, Mr. Roberts unsuccessfully moved for postconviction relief under Florida Rule of Criminal Procedure 3.850. (Doc. 12-2, Exs. 22, 25, 26, 27, 36). This federal habeas petition followed. (Docs. 1, 11).

## II.   Standards of Review

### A.   AEDPA

The Antiterrorism and Effective Death Penalty Act ("AEDPA") governs this proceeding. *Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1364 (11th Cir. 2009). Habeas relief can be granted only if a petitioner is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Section 2254(d) provides that federal habeas relief cannot be granted on a claim adjudicated on the merits in state court unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A decision involves

---

[1] The sexual predator designation was improper because that designation applies only "to an offense committed on or after October 1, 1993," and Mr. Roberts's "offense occurred approximately a decade prior to" that date. *Roberts*, 239 So. 3d at 1289.

an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*

AEDPA was meant "to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). Accordingly, "[t]he focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, and . . . an unreasonable application is different from an incorrect one." *Id.* at 694; *see also Harrington v. Richter*, 562 U.S. 86, 103 (2011) ("As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.").

The state appellate court affirmed Mr. Roberts's conviction and life sentence, as well as the denial of postconviction relief, without discussion. These decisions warrant deference under § 2254(d)(1) because "the summary nature of a state court's decision does not lessen the deference that it is due." *Wright v. Moore*, 278 F.3d 1245, 1254 (11th Cir. 2002). When a state appellate court issues a silent affirmance, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

### B.      Exhaustion of State Remedies; Procedural Default

A federal habeas petitioner must exhaust his claims in state court before presenting them in his federal habeas petition. 28 U.S.C. § 2254(b)(1)(A); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999) ("[T]he state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition."). The exhaustion requirement is satisfied if the petitioner fairly presents his claim in each appropriate state court and alerts that court to the federal nature of the claim. *Picard v. Connor*, 404 U.S. 270, 275-76 (1971).

The doctrine of procedural default provides that "[i]f the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is established." *Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001). A fundamental miscarriage of justice occurs in an extraordinary case where a constitutional violation has probably resulted in the conviction of someone who is actually innocent. *Schlup v. Delo*, 513 U.S. 298, 327 (1995); *Henderson v. Campbell*, 353 F.3d 880, 892 (11th Cir. 2003). To establish cause for a procedural default, a petitioner "must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in state court." *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999). A petitioner demonstrates prejudice by showing that "there is at least a reasonable probability that the result of the proceeding would have been different" absent the constitutional violation. *Henderson*, 353 F.3d at 892.

### C.    Ineffective Assistance of Counsel

Mr. Roberts alleges ineffective assistance of trial counsel. Ineffective-assistance-of-counsel claims are analyzed under the test established in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* requires a showing of deficient performance by counsel and resulting prejudice. *Id*. at 687. Deficient performance is established if, "in light of all the circumstances, the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance." *Id*. at 690. However, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*

Mr. Roberts must show that counsel's alleged error prejudiced the defense because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id*. at 691. To demonstrate prejudice, Mr. Roberts must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Obtaining relief on a claim of ineffective assistance of counsel is difficult on federal habeas review because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (internal quotation and citations omitted); *see also Pooler v. Sec'y, Dep't of Corr.*, 702 F.3d 1252, 1270 (11th Cir. 2012) ("Because we must view Pooler's ineffective counsel claim—which is governed by the deferential *Strickland* test—through the lens of AEDPA

7

deference, the resulting standard of review is doubly deferential."). "The question [on federal habeas review of an ineffective-assistance claim] 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)).

## III.   Discussion

### A.   Ground One—Introduction of Collateral-Act Evidence

Mr. Roberts contends that the trial court violated his constitutional rights by admitting collateral-act evidence concerning his molestation of H.R. and Y.F. (Doc. 11 at 5). As noted above, Mr. Roberts was charged with digitally penetrating H.R.'s vagina when she was approximately nine years old. (Doc. 12-2, Ex. 2). But the court also allowed the prosecution to present evidence that Mr. Roberts committed other acts of sexual abuse against H.R. and Y.F. Specifically, the jury heard that, around the same time as the charged conduct, Mr. Roberts sexually abused H.R. and Y.F. inside a tent by forcing them to touch his penis and by rubbing his penis against Y.F.'s vagina. (*Id.*, Ex. 14, at 210, 261). The jury also learned that Mr. Roberts digitally penetrated Y.F.'s vagina during a sleepover at H.R.'s house. (*Id.* at 260). This collateral-act evidence came in under Fla. Stat. § 90.404(2)(b), which "allow[s] the admission of evidence of other acts of child molestation to corroborate the victim's testimony by showing that the accused had a propensity for such criminal conduct." *Stubbs v. State*, 275 So. 3d 631, 634 (Fla. 4th DCA 2019) (emphasis omitted).

Mr. Roberts contends that the admission of collateral-act evidence violated his constitutional rights because (1) the other acts of child molestation were "not sufficiently similar to the charged offense," (2) the collateral-act evidence "became a key and prejudicial feature of the trial," and (3) H.R.'s and Y.F.'s testimony was "irreconcilably inconsistent." (Doc. 11 at 6-9).

Respondent maintains that Mr. Roberts failed to properly exhaust this claim. (Doc. 12 at 14-20). The Court need not decide that issue because, even assuming Mr. Roberts exhausted his state-court remedies, he cannot show that the rejection of Ground One was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *see also Cook v. McNeil*, 266 F. App'x 843, 846 (11th Cir. 2008) (affirming denial of habeas petition because, "[e]ven if [petitioner] exhausted his due process claim," he could not "establish either that the state courts applied a standard contrary to federal law or that they applied that precedent in an unreasonable manner"); *Acosta v. Artuz*, 575 F.3d 177, 188-89 (2d Cir. 2009) ("Even if we were to assume that [petitioner] adequately exhausted state remedies on the precise challenge to the admission of his confession that he now raises in his habeas petition, we would agree with the district court that no relief is warranted because [he] has not demonstrated that the state court's rejection of his claim on the merits was an objectively unreasonable application of clearly established Supreme Court precedent.").

"'[C]learly established Federal law' for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of [the Supreme] Court's decisions." *White v. Woodall*,

572 U.S. 415, 419 (2014). The Supreme Court has repeatedly cautioned lower courts against framing its decisions at "a high level of generality." *Nevada v. Jackson*, 569 U.S. 505, 512 (2013); *see also Brown v. Davenport*, 596 U.S. 118, 136 (2022) (noting that "holdings that speak only at a high level of generality" "cannot supply a ground for relief" under AEDPA). Accordingly, "it is not 'an unreasonable application of' 'clearly established Federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court." *Knowles*, 556 U.S. at 122; *see also Reese v. Sec'y, Fla. Dep't of Corr.*, 675 F.3d 1277, 1288 (11th Cir. 2012) ("The Supreme Court has reiterated, time and again, that, in the absence of a clear answer—that is, a holding by the Supreme Court—about an issue of federal law, we cannot say that a decision of a state court about that unsettled issue was an unreasonable application of clearly established federal law.").

The Supreme Court has never "squarely established" any constitutional limits on the admission of collateral-act evidence. *Knowles*, 556 U.S. at 122. To the contrary, the Court expressly declined to determine "whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime." *Estelle v. McGuire*, 502 U.S. 62, 75 n.5 (1991). Thus, as several lower courts have recognized, "[t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence." *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003); *see also Coningford v. Rhode Island*, 640 F.3d 478, 484 (1st Cir. 2011) (finding no "clearly established Supreme Court case law speaking directly to the admission of prior bad acts

evidence"); *Flores v. Adams*, 319 F. App'x 514 (9th Cir. 2009) ("[T]he admission of propensity evidence did not entitle [ ] petitioner to habeas relief because there is no clearly established Supreme Court precedent holding that the admission of such evidence is a violation of due process."). The absence of on-point precedent from the Supreme Court is fatal to Mr. Roberts's claim. *See Loggins v. Thomas*, 654 F.3d 1204, 1222 (11th Cir. 2011) ("Because implications are not actual holdings, the implications of Supreme Court decisions cannot clearly establish federal law for § 2254(d)(1) purposes any more than dicta can.").

Even apart from the absence of clearly established federal law, Mr. Roberts cannot show that the admission of collateral-act evidence "failed the due process test of fundamental fairness." *Dowling v. United States*, 493 U.S. 342, 352 (1990). The "category of infractions that violate 'fundamental fairness'" is "very narrow[ ]," and Mr. Roberts cannot show that the trial court unreasonably applied this general principle by admitting collateral-act evidence in his case. *Id.* As noted above, Florida law "allow[s] the admission of evidence of other acts of child molestation to corroborate the victim's testimony by showing that the accused had a propensity for such criminal conduct." *Stubbs*, 275 So. 3d at 634. Here, the collateral-act evidence "corroborate[d]" H.R.'s testimony by showing that, around the same time as the charged conduct, Mr. Roberts engaged in similar acts of molestation against both H.R. and her friend Y.F. *Id.* Moreover, the trial court reasonably concluded that "the probative value of the collateral crimes evidence [was not] substantially outweighed by the danger of unfair prejudice." *Newman v. State*, 300 So. 3d 360, 363 (Fla. 1st DCA 2020). In these circumstances, a reasonable jurist could conclude

11

that the introduction of collateral-act evidence in Mr. Roberts's case was not "so extremely unfair that its admission violate[d] 'fundamental conceptions of justice.'" *Dowling*, 493 U.S. at 352 (citation omitted); *see also Lutz v. Palmer*, No. 3:11-cv-334-LAC-EMT, 2012 WL 4660685, at *16 (N.D. Fla. Sept. 10, 2012) (petitioner "not entitled to relief" because he "failed to identify a Supreme Court case holding that the admission of similar fact or collateral crime evidence in circumstances such as the instant case was unconstitutional"), *adopted by* 2012 WL 4660981 (N.D. Fla. Oct. 3, 2012).

### B.   Ground Two—Exclusion of Evidence about H.R.'s Reputation for Truthfulness

Mr. Roberts contends that the trial court violated his constitutional rights by excluding testimony "regarding [H.R.'s] poor reputation in the community for truth and veracity." (Doc. 11 at 10). Florida law permits a party to "attack the credibility of a person by introducing character evidence in the form of reputation provided that the evidence relates only to the person's reputation for truthfulness." *Larzelere v. State*, 676 So. 2d 394, 399 (Fla. 1996). "As a predicate to the introduction of such evidence, a foundation must be laid to prove that the witness testifying as to reputation is aware of the person's general reputation for truthfulness in the community." *Id.* "[T]he community from which the reputation testimony is drawn [must be] sufficiently broad to provide the witness with adequate knowledge to give a reliable assessment." *Id.* Moreover, "the character evidence must not be so remote in time as to be lacking probative value in showing present character." *Trial Handbook for Florida Lawyers* § 17:4 (3d ed. 2023); *see also Carter v. State*, 485 So. 2d 1292, 1294-95 (Fla. 4th DCA 1986) (trial court properly excluded

12

reputation testimony from person who "had not been in touch with [the witness] for four years prior to trial").

Mr. Roberts sought to introduce reputation evidence through two witnesses—H.R.'s mother and H.R.'s brother. (Doc. 12-2, Ex. 15, at 317-19). During a proffer, the mother testified that she had spoken with H.R.'s "teachers, personal friends, . . . pastors, church members," and that these conversations revealed H.R.'s "reputation for untruthfulness." (*Id.* at 321-22). The mother claimed that she had spoken with these persons "at various times" from H.R.'s "early teens" "up through recently." (*Id.* at 327). She admitted, however, that she had not spoken to H.R. since December 2008—almost seven years before the June 2015 trial. (*Id.*) And she conceded that she did not know where H.R. currently lived. (*Id.* at 328). H.R.'s brother testified that he grew up with H.R. and lived with her "between the ages of 18 and 25." (*Id.* at 338). He claimed that (1) he had spoken about H.R.'s "reputation for truth[fulness]" with mutual friends and "people . . .from school, church, [and] work," and (2) he had learned from these conversations that "you kind of have to take what [H.R.] says with a grain of salt." (*Id.* at 338-39). But he admitted that he had "moved to Croatia in 2004," and that he and H.R. had "not been in the same community" since November 2000. (*Id.* at 341-42). The trial court ultimately declined to admit the reputation testimony, finding that Mr. Roberts had failed to "establish[ ]" a "relevant community." (*Id.* at 354). The court stressed that H.R. had "not lived with her brother for 15 years," and that H.R. had "not talked to [her] mother" since December 2008. (*Id.* at 354-55).

Mr. Roberts now contends that the exclusion of his proffered reputation testimony violated his constitutional "right to present a defense and to put evidence before a jury that might influence the determination of guilt." (Doc. 11 at 11). Respondent argues that this claim is unexhausted. (Doc. 12 at 23-25). The Court need not reach that issue because, even assuming Mr. Roberts properly exhausted the claim, he cannot show that the exclusion of his reputation evidence was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *see also Kitchen v. Sec'y, Fla. Dep't of Corr.*, 571 F. App'x 930, 931 (11th Cir. 2014) (affirming denial of habeas relief because, "even if [petitioner] had exhausted his claims in state court, his petition would fail on the merits" under § 2254(d)).

First, Mr. Roberts does not cite—and this Court cannot locate—any Supreme Court precedent setting constitutional limits on the admission of reputation testimony. Because the Supreme Court's "cases give no clear answer to the question presented, let alone one in [Mr. Roberts's] favor, it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Wright v. Van Patten*, 552 U.S. 120, 126 (2008); *see also Lopez v. Smith*, 574 U.S. 1, 6 (2014) (noting that Supreme Court precedent must "establish clearly the specific rule [a habeas petitioner] needs" before a federal court can grant relief under AEDPA).

Second, Mr. Roberts cannot show that the exclusion of his proposed reputation evidence "failed the due process test of fundamental fairness." *Dowling*, 493 U.S. at 352. Both federal and Florida courts have held that reputation evidence may be excluded where the proposed testimony concerns "a reputation that existed at a time remote from . . . the

14

time of trial." *United States v. Watson*, 669 F.2d 1374, 1381-82 (11th Cir. 1982); *see also United States v. Whitmore*, 359 F.3d 609, 617 (D.C. Cir. 2004) (affirming exclusion of "proposed testimony" as to "alleged reputation for truthfulness" because such testimony was "too remote in time from the time of trial"); *Carter*, 485 So. 2d at 1294-95 (trial court properly excluded reputation testimony from person who "had not been in touch with [the witness] for four years prior to trial"). As noted above, H.R.'s mother did not even know where H.R. lived at the time of trial, and her brother had "not been in the same community" as her for almost fifteen years. (Doc. 12-2, Ex. 15, at 328, 341-42). A reasonable jurist could conclude that any reputation testimony from these two witnesses would be "'too remote' in time from the time of trial" to be probative of H.R.'s current reputation for truthfulness. *Whitmore*, 359 F.3d at 617.

### C.    Ground Three—Exclusion of H.R.'s Allegedly False Prior Accusations

Mr. Roberts argues that the trial court violated his constitutional rights by excluding evidence that H.R. had falsely accused other persons of sexually abusing her and falsely claimed to have cancer. (Doc. 11 at 12-13). Before trial, Mr. Roberts moved to admit evidence that (1) H.R had "lied about being sexually abused by a family friend . . . when she was approximately 16 years old," (2) H.R. had falsely "reported to her mother and family members that she was sexually assaulted on several occasions by unknown males," and (3) H.R. had "made [false] claims of dying of leukemia" and "ovarian cancer." (Doc. 12-2, Ex. 11, at 102-03). Mr. Roberts claimed that these "specific instances" would "demonstrate that [H.R.] ha[d] a well-known history of lying and fabricating elaborate

stories in order to get attention, sympathy[,] and financial assistance from her family and friends." (*Id.* at 102).

The trial court held an evidentiary hearing on the motion. (*Id.*, Ex. 12). H.R.'s mother testified at length about H.R.'s allegedly false accusations, including the ones listed above. (*Id.* at 10-39). For example, she claimed that, when H.R. was in her "late teens," she accused a family friend of raping her. (*Id.* at 13). H.R. allegedly refused to "make a police report" or "go to the hospital," and "about three years later" she supposedly told her mother that the family friend had "never raped [her]." (*Id.* at 14-15, 17). On cross-examination, the prosecutor impeached H.R.'s mother by pointing to several inconsistencies between her testimony and the testimony she had given during a prior deposition. (*E.g.*, *id.* at 47-48). The court also took testimony from the family friend who had allegedly been the subject of H.R.'s false rape allegation. He testified that he had learned about the allegation from H.R.'s mother, but he did not claim to have heard it from H.R. herself. (*Id.* at 68-69).

The court ultimately denied Mr. Roberts's motion to admit the prior false accusations. It noted that H.R.'s mother had made "many allegations against her daughter suggesting her daughter [was] nothing but a liar." (*Id.* at 102). The court found, however, that "[t]he testimony and the way it was presented [were] simply not credible." (*Id.*) H.R.'s mother "was emotional [and] angry" during her testimony, and she described several "detail[s]" that "hadn't been mentioned" at the deposition. (*Id.*) As a result, "there [was] no credible evidence that [the court] could put in front of the jury about this." (*Id.* at 103-04). The court also cited the Florida Supreme Court's decision in *Pantoja v. State*, 59 So.

3d 1092 (Fla. 2011). (*Id.* at 104-06). *Pantoja* held that "a victim's prior false allegation of sexual misconduct [against someone other than the defendant] is not admissible to impeach the victim or prove the victim's bias or propensity to lie." *Rodriguez-Olivera v. State*, 328 So. 3d 1080, 1090 (Fla. 2d DCA 2021) (citing *Pantoja*, 59 So. 3d at 1097-1100). Thus, the court in Mr. Roberts's case ruled that the prior false allegations could not "be used . . . as proper impeachment or cross-examination, and that [ ] Florida law specifically prohibit[ed] [their use] in this particular situation." (Doc. 12-2, Ex. 12, at 109).

Mr. Roberts now contends that the exclusion of this evidence violated both his right to "call witnesses to testify on [his] own behalf" and his right to "confront witnesses against him." (Doc. 11 at 14-15). According to Respondent, this claim is unexhausted. (Doc. 12 at 29-32). Once again, the Court declines to reach that issue because Mr. Roberts cannot show that the exclusion of the allegedly false prior accusations was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *see also Jones v. Dixon*, No. 4:21-cv-292-WS-MJF, 2022 WL 17178752, at *5 (N.D. Fla. Oct. 24, 2022) ("This Court need not decide the exhaustion/procedural default issue, because even assuming to [petitioner's] benefit that his direct appeal brief fairly presented his claim as a federal constitutional violation, he fails to meet § 2254(d)'s demanding standard."), *adopted by* 2022 WL 17178699 (N.D. Fla. Nov. 23, 2022).

As an initial matter, the Supreme Court has never "squarely established" a constitutional right to present the type of impeachment evidence at issue here. *Knowles*, 556 U.S. at 122. "[A]lthough the Supreme Court has frequently held that states must permit

cross-examination that will undermine a witness's testimony, it has never held—or even suggested—that the longstanding rules restricting the use of specific instances and extrinsic evidence to impeach a witness's credibility pose constitutional problems." *Yancey v. Gilmore*, 113 F.3d 104, 108 (7th Cir. 1997). Those longstanding rules rest on "[t]he theory . . . that evidence about lies not directly relevant to the episode at hand could carry courts into an endless parade of distracting, time-consuming inquiries." *Ellsworth v. Warden*, 333 F.3d 1, 8 (1st Cir. 2003). Thus, several courts have held that, "[n]o matter how central an accuser's credibility is to a case . . . the Constitution does not require that a defendant be given the opportunity to wage a general attack on credibility by pointing to individual instances of past conduct." *Boggs v. Collins*, 226 F.3d 728, 740 (6th Cir. 2000); *see also United States v. Bartlett*, 856 F.2d 1071, 1089 (8th Cir. 1988). Under this line of authority, a defendant does not have a constitutional right to attack a victim's credibility by suggesting that, because the victim "lied or fabricated once, [he] would do so again." *Boggs*, 226 F.3d at 739. Here, Mr. Roberts contends that H.R.'s allegedly false prior accusations would have "substantially weakened . . . her credibility" by showing her "history of fabricating stories to get attention." (Doc. 11 at 15). Because the Supreme Court has never "squarely established" a right to present such evidence, Mr. Roberts is not entitled to federal habeas relief. *Knowles*, 556 U.S. at 122.

Even if such a right were clearly established, Mr. Roberts cannot show that the trial court acted unreasonably in excluding H.R.'s allegedly false prior accusations. Those accusations "would have only undermined [H.R.'s] credibility if [they] were indeed false." *Abram v. Gerry*, 672 F.3d 45, 51 (1st Cir. 2012). As noted above, the trial court found that

H.R.'s mother—the witness who would testify about H.R.'s accusations—was "simply not credible." (Doc. 12-2, Ex. 12, at 102). "Determining the credibility of witnesses is the province and function of the state courts, not a federal court engaging in habeas review." *Consalvo v. Sec'y for Dep't of Corr.*, 664 F.3d 842, 845 (11th Cir. 2011). Mr. Roberts has not shown by "clear and convincing evidence" that the court's credibility determination was erroneous. 28 U.S.C. § 2254(e)(1). Thus, he cannot overcome the "presumption of correctness" afforded to that determination. *Consalvo*, 664 F.3d at 845. And because Mr. Roberts failed to establish "the falsity of the [prior] accusations"—or even that H.R. made them in the first place—"the court did not unreasonably apply federal law by excluding this evidence." *Abram*, 672 F.3d at 51-52; *see also Cookson v. Schwartz,* 556 F.3d 647, 654 (7th Cir. 2009) (rejecting habeas claim because petitioner could not establish that excluded sexual assault allegation was false to a "reasonable probability").

### D.    Ground Four, Sub-Claim A—Failure to Present Evidence Concerning Mr. Roberts's Genitalia

As noted above, H.R. testified at trial that she observed a scar "[c]lose to [Mr. Roberts's] penis," although she could not recall whether it was "near the pubic area." (Doc. 12-2, Ex. 14, at 253). H.R.'s mother, by contrast, stated that Mr. Roberts did not have any scars "on his pelvic area" or "near his scrotum." (*Id.*, Ex. 15, at 377). She did acknowledge, however, that he had a scar "right around his belt" from being mauled by a "bull on [a] farm." (*Id.*) During closing argument, Mr. Roberts's counsel stressed the "inconsistency" between H.R.'s description of the scar and her mother's account. (*Id.* at 426-27). In rebuttal, the prosecution argued that their testimony was "not inconsistent," because H.R.

claimed only that she had seen a "scar[ ] near the penis," and H.R.'s mother stated that the scar was "down by his belt." (*Id.* at 440-41). In any event, the prosecution maintained, any discrepancy could be explained by "look[ing] at it through the eyes of a child, [who] is looking down and [ ] has to touch the penis. What's the other thing in that area she sees? The pubic hair and the scar." (*Id.* at 441).

Mr. Roberts now contends that counsel provided ineffective assistance by failing to "present[ ] proof that [he] had no such scar near his genitals." (Doc. 11 at 19). In Mr. Roberts's view, counsel should have either (1) provided "photographs of [Mr. Roberts's] genitals" to the jury or (2) "ha[d] the jury view [Mr. Roberts's] genitalia outside the view of the public." (*Id.*) According to Mr. Roberts, "[h]ad trial counsel investigated and presented this dispositive evidence regarding the lack of any scar by [his] genitalia, the outcome of the proceedings would surely have been different." (*Id.*)

The postconviction court rejected this claim, finding that counsel "was not ineffective for failing to present this evidence." (Doc. 12-2, Ex. 27, at 17). The court explained that, "[a]t best, the evidence would have shown, as the State conceded in closing argument, that H.R. was mistaken about the location of the scar, given the defense evidence that he had a scar near the 'belt' area." (*Id.*) According to the court, "[g]iven the State's concession in front of the jury on this issue, there [was] no reasonable probability that presenting a photo or jury view of [Mr. Roberts's] penis would have resulted in a different outcome." (*Id.*)

The rejection of this claim was reasonable. "The prejudice prong requires the petitioner to establish a reasonable probability that, but for counsel's errors, the outcome

at trial would have been different." *Reed v. Sec'y, Fla. Dep't of Corr.*, 767 F.3d 1252, 1261 (11th Cir. 2014). "It is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693. Instead, "counsel's errors [must be] so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable." *Id.* at 687. "Applying AEDPA to *Strickland*'s prejudice standard, [this Court] must decide whether the state court's conclusion that [counsel's] performance . . . didn't prejudice [Mr. Roberts]—that there was no substantial likelihood of a different result—was so obviously wrong that its error lies beyond any possibility for fairminded disagreement." *Mungin v. Sec'y, Fla. Dep't of Corr.*, 89 F.4th 1308, 1317 (11th Cir. 2024).

Mr. Roberts cannot meet this demanding standard. As noted above, H.R. claimed she saw a scar "[c]lose to [Mr. Roberts's] penis," while H.R.'s mother said he had a scar "right around his belt." (Doc. 12-2, Ex. 14, at 253; Doc. 12-2, Ex. 15, at 377). Even if the jury had viewed Mr. Roberts's genitalia and seen that the scar was "above his belt line," there is no reasonable probability that the outcome at trial would have been different. (Doc. 11 at 20). A scar in that location could plausibly be described as "close to [Mr. Roberts's] penis." (Doc. 12-2, Ex. 14, at 253). And, as the prosecution argued in closing, any inaccuracy in H.R.'s recollection could be explained by the circumstances in which she saw Mr. Roberts's genitalia—that is, as an approximately nine-year-old child being molested by her stepfather. (*Id.*, Ex. 15, at 441). Accordingly, a reasonable jurist could conclude that Mr. Roberts was not prejudiced by counsel's failure to present the jury with a visual depiction of his genitalia.

### E.     Ground Four, Sub-Claim B—Failure to Investigate Alleged Contacts Between H.R. and Y.F.

Mr. Roberts faults trial counsel for failing to investigate the possibility that H.R. and Y.F. "lied in claiming they were not in contact with one another." (Doc. 11 at 20). According to Mr. Roberts, he "shared with his trial counsel that, based on information and belief, both H.R. and Y.F.'s Facebook pages were taken down immediately following [his] arrest." (*Id.*) Mr. Roberts also claims that, during her deposition, Y.F. "testified to matters that could have only been learned through communications with H.R. via her Facebook page." (*Id.* at 20-21). Specifically, Y.F. stated that she had "heard about the murder of Kourtney Zanetti, who was a friend of the Roberts family and allegedly murdered by her own grandmother." (*Id.* at 21 n.6). According to Mr. Roberts, H.R. posted this information on her Facebook page. (*Id.*) He speculates that, "[b]ecause Y.F. did not know Kourtney, H.R.'s Facebook post would have served as the only source of Y.F.'s knowledge regarding that incident, showing they were friends and otherwise communicated via Facebook." (*Id.*) Mr. Roberts argues that, had such alleged "contact" been "investigated and proven," the credibility of both H.R. and Y.F. would have been undermined "such that no jury would have convicted [him] of the crime alleged against him." (*Id.* at 21).

The postconviction court rejected this claim on the ground that it was "speculative." (Doc. 12-2, Ex. 27, at 17). According to the court, "the fact that both H.R. and Y.F. closed their Facebook pages [did] not lead to the inference that they were in contact." (*Id.*) The court also found that, "even if the allegations were not speculative, the mere fact that the two communicated would not be independently relevant to be presented as extrinsic

evidence to impeach their statements that they never spoke after H.R. moved away." (*Id.*) In the court's view, "[w]hether or not the two spoke after H.R. moved to Georgia ha[d] no relevance to whether the abuse occurred, nor would the mere fact of their communication lead to a reasonable inference that they were not truthful about the allegations of abuse." (*Id.*) Thus, any extrinsic evidence about alleged communications between H.R. and Y.F. would have been inadmissible under Florida law. (*Id.*; *see also Foster v. State*, 869 So. 2d 743, 745 (Fla. 2d DCA 2004) ("Generally, impeachment on a collateral issue is impermissible.")).

The denial of this claim was reasonable. First, the postconviction court correctly rejected as "speculative" Mr. Roberts's assertion that, because both H.R. and Y.F. closed their Facebook pages after his arrest, they were "in contact" with each other before the hearings in this case. (Doc. 12-2, Ex. 27, at 17). As the postconviction court explained, such "speculation is insufficient to carry the burden of a habeas corpus petitioner." *Johnson v. Alabama*, 256 F.3d 1156, 1187 (11th Cir. 2001).

Second, Mr. Roberts did not allege in his Rule 3.850 motion that H.R. had posted on Facebook about Ms. Zanetti's murder. (Doc. 12-2, Ex. 26). Instead, he makes that allegation for the first time in his federal habeas petition. "[A] review of a state court adjudication on the merits in light of allegations not presented to the state court—for example, by examining additional facts or claims presented for the first time in a petitioner's federal habeas petition—would insufficiently respect the historic and still vital relation of mutual respect and common purpose existing between the States and the federal courts." *Borden v. Allen*, 646 F.3d 785, 816 (11th Cir. 2011). Accordingly, this Court

cannot "consider [Mr. Roberts's] supplemental allegations . . . when reviewing the reasonableness of the state court's resolution of this claim, which was based on the allegations before it." *Powell v. Allen*, 602 F.3d 1263, 1273 n.8 (11th Cir. 2010). And even if the Court could consider these new allegations, they do not establish that H.R. and Y.F. "communicated via Facebook." (Doc. 11 at 21 n.6). Mr. Roberts presents no evidence that H.R.'s alleged Facebook post "would have served as the only source of Y.F.'s knowledge" concerning the murder of Ms. Zanetti. (*Id.*)

Third, the postconviction court concluded that, even if Mr. Roberts's allegations were not speculative, any evidence that H.R. and Y.F. "communicated" with each other would be inadmissible under Florida law. (Doc. 12-2, Ex. 27, at 17). "[A]lthough the issue of ineffective assistance . . . is one of constitutional dimension," a court "must defer to the state's construction of its own law when the validity of the [ineffective-assistance] claim . . . turns on state law." *Pinkney v. Sec'y, DOC*, 876 F.3d 1290, 1295 (11th Cir. 2017). Here, the postconviction court found that counsel was not deficient because, as a matter of Florida law, any evidence that H.R. and Y.F. had communicated could not be "presented as extrinsic evidence." (Dkt. 12-2, Ex. 27, at 17). Thus, the postconviction court "already has told us how the issue[ ] would have been resolved under Florida state law had [counsel] done what [Mr. Roberts] argues [s]he should have done." *Herring v. Sec'y Dep't of Corr.*, 397 F.3d 1338, 1354-55 (11th Cir. 2005). This Court is bound to defer to that determination. *See Hagins v. Sec'y*, No. 8:19-cv-3145-TPB-AAS, 2022 WL 17067376, at *4 (M.D. Fla. Nov. 17, 2022) (holding that, in evaluating *Strickland* claim, a federal court

"must defer to the state court's" resolution of "underlying questions of state evidentiary law").

**F.      Ground Four, Sub-Claim C—Failure to Investigate Witnesses**

Mr. Roberts contends that trial counsel was ineffective for failing to investigate or contact "any of the witnesses whose information [he] provided . . . during the pendency of his case." (Doc. 11 at 21). The only potential witness described in the petition is Charlie Blair. (*Id.* at 21-22). Mr. Blair lived in the Pinellas Park house where the sexual abuse occurred. (*Id.* at 21). Thus, he was allegedly "privy to the closeness of the family and personally witnessed the healthy and loving relationship between [Mr. Roberts] and H.R." (*Id.* at 21-22). Mr. Roberts contends that such testimony "would have assisted the jury in understanding [that] the day-to-day lifestyle of the family was not at all how it was presented to them by H.R., and that there were no signs of any issues at the time the abuse was alleged to have occurred." (*Id.* at 22).

The postconviction court found that counsel was not deficient for failing to call Mr. Blair as a witness. (Doc. 12-2, Ex. 27, at 15). In the court's view, Mr. Blair's proposed testimony "would have been cumulative" because H.R.'s mother testified at trial that "H.R.'s relationship with [Mr. Roberts] was 'happy,' that she was 'close' to [him], [and] that she never gave any indication that she was uncomfortable around [him] or that he had sexually abused her." (*Id.*) The court thus held that "[c]ounsel [was not] ineffective, nor [was Mr. Roberts] prejudiced by, counsel's failure to present cumulative evidence." (*Id.*)

That ruling was reasonable. "A petitioner cannot establish ineffective assistance by identifying additional evidence that could have been presented when that evidence is

merely cumulative." *Van Poyck v. Fla. Dep't of Corr.*, 290 F.3d 1318, 1324 n.7 (11th Cir. 2002). "[E]vidence presented in postconviction proceedings is 'cumulative' or 'largely cumulative' to or 'duplicative' of that presented at trial when it tells a more detailed version of the same story told at trial or provides more or better examples or amplifies the themes presented to the jury." *Tanzi v. Sec'y, Fla. Dep't of Corr.*, 772 F.3d 644, 660 (11th Cir. 2014) (quoting *Holsey v. Warden*, 694 F.3d 1230, 1260-61 (11th Cir. 2012)). Here, as the postconviction court explained, H.R.'s mother testified that H.R. had a "happy" relationship with Mr. Roberts, that she was "close to him," and that she never disclosed any sexual abuse as a child. (Doc. 12-2, Ex. 15, at 364). Accordingly, a reasonable jurist could conclude that Mr. Blair's proposed testimony—that "there were no signs of any issues at the time the abuse was alleged to have occurred"—would have been cumulative.[2] (Doc. 11 at 22).

### G.    Ground Five—Alleged "Obstruct[ion]" of Mr. Roberts's Right to Testify

Mr. Roberts contends that trial counsel "misadvis[ed] [him] about his right and need to testify at trial." (Doc. 11 at 25). According to Mr. Roberts, counsel "advised [him] he could not testify at trial because he was hesitant in his speech patterns, and not a seasoned

---

[2] Mr. Roberts attaches a list of other proposed witnesses, but he does not describe the substance of their testimony, nor does he explain how counsel was deficient for failing to investigate or call them. (Doc. 11-11). Thus, he fails to establish that counsel was ineffective as to these witnesses. *See United States v. Ashimi*, 932 F.2d 643, 650 (7th Cir. 1991) ("[E]vidence about the testimony of a putative witness must generally be presented in the form of actual testimony by the witness or on affidavit. A defendant cannot simply state that the testimony would have been favorable; self-serving speculation will not sustain an ineffective assistance claim."). Additionally, in his Rule 3.850 motion, Mr. Roberts faulted counsel for failing to adequately question H.R.'s mother at trial and failing to present testimony from the family friend whom H.R. had allegedly accused of rape. (Doc. 12-2, Ex. 26, at 18-21). Mr. Roberts does not expressly raise these claims in his federal habeas petition, but even if he had, he would not be entitled to relief because the postconviction court reasonably found that they lacked merit. (*Id.*, Ex. 27, at 14-15).

witness." (*Id.*) Mr. Roberts also alleges that counsel "refused" to "go over with him, prior to trial, how to be a good witness." (*Id.*) Had counsel "advised him correctly," Mr. Roberts allegedly would have testified that (1) he did not "discipline" H.R. by "ground[ing] her and lock[ing] her in her room all summer," (2) he "did not have the physical characteristics [H.R.] described," and (3) he "did not do the criminal acts for which he was accused." (*Id.*) Mr. Roberts argues that this "dramatically exculpatory testimony" would have led to a "different" outcome at trial. (*Id.* at 26-27).

The postconviction court rejected this claim, holding that Mr. Roberts's "alleged testimony would have been either cumulative or inadmissible." (Doc. 12-2, Ex. 27, at 12). The court began by noting that Mr. Roberts's "testimony would not have been necessary to establish" that he "did not ground H.R. and lock her in her room all summer." (*Id.* at 9). As the court explained, H.R. "did not testify that she was 'locked' in her room all summer"; instead, "she testified that she had to 'stay in [her] room except for dinnertime' when she was grounded that summer." (*Id.* (citation omitted)). Moreover, H.R.'s mother testified that "she never grounded H.R. for 'months at a time,' such as an entire summer, and the longest H.R. had ever been grounded was 'two to three weeks.'" (*Id.* (citation omitted)). The court thus concluded that Mr. Roberts did not need to testify in order to "establish that 'he did not ground H.R. and lock her in her room all summer.'" (*Id.* at 10).

Next, the court turned to Mr. Roberts's allegation that "he would have 'demonstrated that there was zero probability that based on his physical size he could wear H.R.'s childhood dresses,' which would have 'directly contradicted H.R.'s accusations.'" (*Id.*) The court found that "H.R. did not testify that [Mr. Roberts] ever wore her dresses, so

this rebuttal testimony would have been irrelevant and inadmissible." (*Id.*) Indeed, at a pretrial hearing, the trial court excluded any reference to Mr. Roberts's alleged wearing of H.R.'s dresses. (*Id.*, Ex. 10, at 25-26).

The postconviction court also addressed Mr. Roberts's claim that he "would have testified that 'he simply did not do the criminal acts H.R. was accusing him of.'" (*Id.*, Ex. 27, at 11). The court acknowledged that such testimony "would have been admissible." (*Id.*) It noted, however, that "the jury was told that [Mr. Roberts] had pled 'not guilty'— denying the charges against him—and that they were to presume him innocent unless and until the evidence showed otherwise beyond a reasonable doubt." (*Id.*) Thus, his "statement that he 'did not do the criminal acts' was not necessary to tell the jury that he denied abusing the victims or show that H.R. was not credible." (*Id.* at 11-12).

Finally, the court observed that "counsel cross-examined both H.R. and Y.F. extensively to attack their credibility and presented multiple witnesses as well with the goal of undercutting their credibility." (*Id.* at 12). As a result, Mr. Roberts's testimony was not "the only way to prove to the jury that H.R. was not to be believed"; rather, "counsel presented a great deal of evidence to accomplish that task." (*Id.*) Thus, the court held, counsel was not deficient in advising Mr. Roberts not to testify. (*Id.*) The court also concluded that, "even if counsel were deficient, [Mr. Roberts] was not prejudiced" because the "facts to which [he] alleges he would have testified were either already in the record or inadmissible." (*Id.*) And "[d]espite the presence of that evidence, most of it from witnesses less interested in the outcome than [Mr. Roberts], the jury found [him] guilty beyond a reasonable doubt." (*Id.*) Accordingly, the court found no "reasonably probability that, had

28

the jury heard [Mr. Roberts] repeat that evidence, it would have decided not to believe H.R. and Y.F. and acquitted him." (*Id.* at 12-13).

The rejection of this claim was reasonable. First, Mr. Roberts's proposed testimony about disciplining H.R. was cumulative of testimony from H.R.'s mother about the same topic. Because Mr. Roberts would have merely "amplifie[d] [a] theme[ ] presented to the jury," a competent attorney could have concluded that his testimony was unnecessary. *Tanzi*, 772 F.3d at 660. Second, the court correctly noted that "H.R. did not testify that [Mr. Roberts] ever wore her dresses, so [any] rebuttal testimony [about his physical characteristics] would have been irrelevant and inadmissible." (Doc. 12-2, Ex. 27, at 10). Third, the court reasonably concluded that Mr. Roberts's denial of the allegations against him was "not necessary to tell the jury that he denied abusing the victims or show that H.R. was not credible." (*Id.* at 11-12). Indeed, "a simple denial of the charges is implicit in the entry of a not guilty plea." *Williams v. United States*, No. 00-cr-1008-NRB, 2011 WL 3296101, at *10 n.12 (S.D.N.Y. July 28, 2011). Lastly, the court reasonably found no prejudice from the absence of Mr. Roberts's proposed testimony because it was either cumulative or inadmissible.[3]

## H.    Ground Six—Failure to Retain and Call Expert on Child Memory

Mr. Roberts contends that trial counsel was "ineffective for failing to retain and call an expert in the area of child witness testimony." (Doc. 11 at 29). According to Mr. Roberts,

---

[3] In his federal habeas petition, Mr. Roberts does not expressly challenge the voluntariness of his decision not to testify. Even if he had raised this argument, he would not be entitled to relief. The postconviction court correctly found, based on Mr. Roberts's extensive colloquy with the trial court, that Mr. Roberts "understood that, despite what counsel may tell him about his being a bad witness or counsel's not wanting to call him as a witness, the decision [whether to testify] was his to make." (Doc. 12-2, Ex. 27, at 9).

such an expert could have explained that "H.R. [and Y.F. were] not credible [because their] 'recollections' were likely based on other things from [their] environment and upbringing." (*Id.* at 30). More specifically, Mr. Roberts contends that an expert could have "analyze[d] [H.R. and Y.F.'s] upbringing, to examine any social factors or other issues which could have brought to light how they came to form the false memories to which they testified, and the expert would have been able to explain the mental and physiological mechanisms by which false memories are created." (*Id.* at 31). Mr. Roberts maintains that "this was a critical and necessary aspect of [his] defense, which went wholly ignored and would have changed the outcome of the case." (*Id.* at 32).

The postconviction court rejected this claim on the ground that "testimony on [this] subject would not have been admissible." (Doc. 12-2, Ex. 27, at 19). Citing Florida law, the court explained that "[t]estimony about the formation of false memories and what can lead to the formation of false memories would only be relevant if the jury had heard evidence suggesting that the victims' memories were falsely created or became false over time." (*Id.* at 20 (emphasis omitted)). Here, the court explained, "[n]o such evidence was presented." (*Id.*) Instead, Mr. Roberts maintained that "inconsistencies" in the witnesses' testimony "would form the basis for this expert testimony." (*Id.*) Because "[n]othing in the alleged expert testimony indicate[d] that mere inconsistencies between witnesses would indicate that the witnesses' memories had been falsely implanted or formed," "this evidence would not have been admissible." (*Id.*) Thus, the court found that counsel was not deficient for "failing to make the futile attempt to introduce evidence that would be inadmissible." (*Id.*)

That ruling was reasonable. As noted above, "although the issue of ineffective assistance . . . is one of constitutional dimension," a court "must defer to the state's construction of its own law when the validity of the [ineffective-assistance] claim . . . turns on state law." *Pinkney*, 876 F.3d at 1295. Here, the postconviction court found that counsel was not deficient because, as a matter of Florida law, the proposed expert testimony "would not have been admissible." (Doc. 12-2, Ex. 27, at 20). Thus, the postconviction court "already has told us how the issue[ ] would have been resolved under Florida state law had [counsel] done what [Mr. Roberts] argues [s]he should have done." *Herring*, 397 F.3d at 1354-55. That determination binds this Court. *See Ward v. Dep't of Corr.*, No. 20-13797-C, 2021 WL 4772143, at *4 (11th Cir. Apr. 20, 2021) ("The state court denied this claim based on its finding that [the proposed witness's] testimony would not have been admissible under Florida law, and the district court correctly found that it should not second-guess such a finding."); *Ward v. Sec'y, Dep't of Corr.*, No. 3:17-cv-407-MCR-MJF, 2019 WL 10369038, at *9 (N.D. Fla. Oct. 10, 2019) ("Because this court will not 'second guess' the state courts' conclusion that the evidence was inadmissible under Florida's evidentiary standards, [petitioner] cannot demonstrate counsel was deficient for failing to offer it."), *adopted by* 2020 WL 5441566 (N.D. Fla. Sept. 10, 2020).

Because the postconviction court "authoritatively decided as a matter of [Florida] law" that Mr. Roberts's proposed expert testimony was inadmissible, the remainder of the analysis is straightforward. *Calhoun v. Warden, Baldwin State Prison*, 92 F.4th 1338, 1351 (11th Cir. 2024). It is well established that a lawyer cannot be "ineffective for failing to offer inadmissible evidence." *Tompkins v. Moore*, 193 F.3d 1327, 1334 (11th Cir. 1999).

31

Therefore, the postconviction court reasonably concluded that counsel was not deficient for failing to present inadmissible testimony from an expert on "child memory." (Doc. 11 at 29).

## I.      Ground Seven—Failure to Seek Recusal of Trial Judge

Finally, Mr. Roberts contends that trial counsel was ineffective for failing to seek recusal of the judge who "ultimately presided over [his] trial." (*Id.* at 34). According to Mr. Roberts, he harbored a "reasonable belief" that the judge "could not be fair and impartial" based on her "comments [during a pretrial hearing] about the lack of credibility of several defense witnesses and the credibility of H.R. [and Y.F.]" (*Id.* at 35). Specifically, Mr. Roberts complains that the judge found H.R. and Y.F. "credible" when she allowed the prosecution to present collateral-act evidence concerning Mr. Roberts's sexual abuse of them. (*Id.* at 38). He also complains that, in ruling on the admissibility of his proposed reputation evidence, the judge found H.R.'s mother and brother "not credible." (*Id.*) According to Mr. Roberts, his "well-founded fear that he would not receive a fair trial from [the presiding judge]" "would have necessitated her recusal had the appropriate motion been filed." (*Id.* at 39).

The postconviction court rejected this claim, holding that "[a]ny motion that trial counsel could have presented seeking to disqualify the trial judge would have been legally insufficient." (Doc. 12-2, Ex. 27, at 22). Citing Florida law, the court explained that "[t]he legal sufficiency of a motion to disqualify depends on whether the facts alleged would place a reasonably prudent person in fear of not receiving a fair and impartial trial." (*Id.* at 21-22). Moreover, a "motion to disqualify a judge must be well-founded and contain facts

and reasons that tend to show the judge's undue bias, prejudice, or sympathy." (*Id.* at 22). The court concluded that "the trial judge's alleged comments [did] not appear to have gone so far as to express a fixed opinion regarding [Mr. Roberts's] guilt; [instead], they indicated only that the State's witnesses appeared credible and that the defense witnesses did not." (*Id.*) Accordingly, any motion to recuse the trial judge would have failed. (*Id.*)

The rejection of this claim was reasonable. The postconviction court found that counsel was not deficient because any motion to recuse would have been meritless under Florida law. (*Id.*) Thus, the postconviction court "already has told us how the issue[ ] would have been resolved under Florida state law had [counsel] done what [Mr. Roberts] argues [s]he should have done." *Herring*, 397 F.3d at 1354-55. This Court is bound by that determination. *See Queen v. Sec'y, Fla. Dep't of Corr.*, No. 3:19-cv-1477-HLA-JBT, 2023 WL 168782, at *12 (M.D. Fla. Jan. 12, 2023) ("As a federal habeas court, this Court must defer to the state post-conviction court's conclusion that, under state law, Petitioner's allegations were insufficient to show that Judge Johnson was biased, such that trial counsel had any Sixth Amendment obligation to move for her disqualification."); *Post v. Sec'y*, No. 5:19-cv-382-VMC-PRL, 2022 WL 4384487, at *7 (M.D. Fla. Sept. 22, 2022) (rejecting ineffective-assistance claim because "the state court's determination that the motion to disqualify was legally insufficient . . . rests upon an application of Florida law," and a federal court "must defer to that finding in reviewing the state court's ruling on [petitioner's] *Strickland* claim").

It is well established that "[a] lawyer cannot be deficient for failing to raise a meritless claim." *Freeman v. Atty. Gen.*, 536 F.3d 1225, 1233 (11th Cir. 2008). Thus, the

postconviction court reasonably concluded that counsel was not deficient for failing to file a meritless recusal motion.

## IV.   Conclusion

Accordingly, the Court **ORDERS**:

1. Mr. Roberts's amended petition (Doc. 11) is **DENIED**.

2. The **CLERK** is directed to enter judgment against Mr. Roberts and to **CLOSE** this case.

3. Mr. Roberts is not entitled to a certificate of appealability. A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). "A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To obtain a certificate of appealability, Mr. Roberts must show that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues he seeks to raise. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Mr. Roberts has not made the requisite showing. Because Mr. Roberts is not entitled to a certificate of appealability, he is not entitled to appeal *in forma pauperis*.

**DONE AND ORDERED** in Tampa, Florida, on August 23, 2024.

WILLIAM F. JUNG
UNITED STATES DISTRICT JUDGE